IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

EDWARD L. VAUGHAN )
    Plaintiff, )
  )
  )
    v. )     Civil No. 3:13cv589 (HEH)
  )
CAROLYN W. COLVIN )
Acting Commissioner of Social Security, )
    Defendant. )
  )

## REPORT AND RECOMMENDATION

Edward L. Vaughan ("Plaintiff") is 68 years old and previously worked as a security

guard and store manager. On July 27, 2010, Plaintiff applied for disability insurance benefits

("DIB"), claiming disability from degenerative disc disease, spinal stenosis and vision and

hearing difficulties, with an alleged onset date of June 5, 2009. The claim was denied both

initially and upon reconsideration. On November 16, 2011, Plaintiff appeared before an

Administrative Law Judge ("ALJ"), who denied Plaintiff's claim in a written decision on

December 7, 2011. On June 28, 2013, the Appeals Council granted Plaintiff's request for review

of the ALJ's decision and issued a corrective decision finding that Plaintiff was not disabled,

making the corrective decision the final decision of the Commissioner.[1]

Plaintiff now appeals the Commissioner's decision in this Court pursuant to 42 U.S.C.

§ 405(g), arguing that the ALJ erred in assessing Plaintiff's credibility, that the Appeals Council

erred in affording Plaintiff's treating physician less than controlling weight and that the ALJ and

---

[1]    The Appeals Council may review a case and make its own revised decision. 20 C.F.R.
§§ 404.981, 416.1481. The revised decision becomes binding on the parties unless a party
appeals to a federal district court within sixty days after the date that the party receives notice of
the Appeals Council's action. 20 C.F.R. §§ 404.981, 416.1481.

Appeals Council erred in assessing the opinion of the state agency physician. Defendant responds that substantial evidence in the record supports the Commissioner's decisions and that the ALJ and Appeals Council properly addressed the opinion of the state agency physician. The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 15) be DENIED and that the final decision of the Commissioner be REVERSED and REMANDED.

I.     BACKGROUND

Because Plaintiff alleges that the ALJ and Appeals Council erred in determining Plaintiff's credibility, affording less than controlling weight to Plaintiff's treating physician and addressing the state agency physician's opinion, Plaintiff's work history, medical records, state agency physician's opinion, Plaintiff's function reports and Plaintiff's testimony are summarized below.

A. Education and Work History

Plaintiff was 65 years old and married when he applied for DIB. (R. at 36-37). Plaintiff completed school through the tenth grade, earned his GED, completed two years of college and received some additional education while in the military. ( R. at 36-37.) Plaintiff previously worked as a driver, security guard and as a manager. (R. at 69-70.)

B. Medical Records

1. Prakasam Kalluri, M.D.

On June 5, 2009, Prakasam Kalluri, M.D. saw Plaintiff, complaining of lower back and right leg pain. (R. at 357.) Plaintiff reported that his right leg pain and weakness were greater than pain and weakness in his left leg and stated that he had fallen on several occasions. (R. at 357.) His pain affected his bowels and bladder, and he suffered from urinary urgency, bowel incontinence and incomplete emptying of his bladder. (R. at 357.) Dr. Kalluri recommended an MRI of the lumbar spine and early decompression. (R. at 357.) Plaintiff suffered from progression of cauda equina syndrome, but Dr. Kalluri remained unsure of the urgency of the neurologic situation, because Plaintiff experienced incontinence of bowel and bladder function. (R. at 357.) Dr. Kalluri signed a certificate excusing Plaintiff from work for approximately one week. (R. at 519.)

On June 8, 2009, Plaintiff returned, complaining of worsening back pain and loss of urinary and bowel control. (R. at 234.) Plaintiff was working full-time in physician sales and service. (R. at 234.) Plaintiff had forward leaning standing posture, possibly due to stenosis, and normal sitting posture. (R. at 235.) Plaintiff suffered from moderate and bilateral tenderness. (R. at 235.) Plaintiff had antalgic and forward leaning gait and limited heel-to-toe walking. (R. at 235.) During his lower extremity sensory exam, Plaintiff had decreased light touch in the bilateral S1 to perianal distribution. (R. at 235). Dr. Kalluri evaluated an MRI and diagnosed Plaintiff as having L3-S1 stenosis with cauda equina syndrome, L4-5 spondylolisthesis and L5-S1 degenerative disc disease. (R. at 364.) Dr. Kalluri planned for a decompression with instrumented fusion and autograft. (R. at 236.) Dr. Kalluri anticipated that Plaintiff would miss 8-12 weeks of work following surgery. (R. at 364.)

3

On June 12, 2009, Plaintiff underwent an L3-Sl decompression, laminectomy, facetectomy and posterior fusion. (R. at 146.) Dr. Kalluri reported no complications and two radiographs taken post-operatively showed proper placement of hardware. (R. at 384.) The findings of the radiographs had not changed significantly from the MRI of Plaintiff's lumbar spine taken on January 24, 2008. (R. at 389.)

On June 12, 2009, Plaintiff met with Dr. Kalluri and reported that his pain and bowel and bladder control had improved post-operatively. (R. at 367.) He did not report any fevers, chills or saddle anesthesia. (R. at 367.) Dr. Kalluri noted that the incision was healing well, his bilateral knees were mildly swollen and that pain inhibited Plaintiff's weakness of both quadriceps. (R. at 367.) Plaintiff had no focal motor deficits, and x-rays showed that the hardware placed during the surgery was in good position. (R. at 367.) Dr. Kalluri planned for Plaintiff to continue rehabilitation and scheduled follow-up in five weeks for repeat x-rays of the lumbar spine. (R. at 367.)

On July 27, 2009, Plaintiff reported experiencing aching in his lower back that radiated down his right leg, numbness in his right leg and toes, and weakness in both legs. (R. at 369.) Other than mild urinary urge incontinence, Plaintiff had normal bowel and bladder control. (R. at 369.) Dr. Kalluri ordered Plaintiff to start physical therapy and to continue using a cane for ambulation. (R. at 369.) On August 6, 2009, Plaintiff again visited Dr. Kalluri, who reported that Plaintiff still experienced mild paraspinal tenderness and bilateral foot numbness, but did not have any motor deficits. (R. at 374.) Dr. Kalluri signed a certificate excusing Plaintiff from work for approximately three months due to total incapacitation. (R. at 533.)

On August 31, 2009, Plaintiff underwent a CT scan of his lumbar spine due to increased radioculopathy. (R. at 384.) At the L3-L4 space, Plaintiff had concentric disc bulge and mild

4

disc space narrowing without subluxation. (R. at 384.) The scan also revealed degenerative narrowing of the L5-S1 disc space and a small amount of degenerative spurring along the adjacent L5-S1 vertebral endplates posteriorly. (R. at 384.) There was also narrowing of the L5-S1 neural foramina bilaterally and dominantly on the left. (R. at 384.) On September 4, 2009, Plaintiff followed up with Dr. Kalluri and his evaluation was largely unchanged. (R. at 375.)

On October 2, 2009, Plaintiff reported to Dr. Kalluri that Plaintiff's pain and urinary incontinence symptoms were steadily improving. (R. at 378.) Plaintiff's lumbar range of motion decreased in flexion and reached nearly full extension. (R. at 378.) His motor exam remained intact and his sensory exam with bilateral L5 numbness was without significant hypersensitivity. (R. at 378.)

On December 4, 2009, Plaintiff presented with weakness in his extremities. (R. at 471.) Plaintiff experienced no numbness or tingling and had no impairment of tandem walking, walking on toes, walking on heels or impairment in his gait. (R. at 471.) Examination of his lumbosacral spine revealed no fractures or deformities. (R. at 472.) Upon palpation and inspection, Plaintiff had no tenderness or pain, and Plaintiff exhibited normal trunk and hip movements without instability, creptus or evidence of fractures or deformities. (R. at 472.)

Dr. Kalluri considered Plaintiff fully disabled due to significant neurologic injury to the cauda equina and incomplete recovery. (R. at 472.) Dr. Kalluri noted that while Plaintiff's motor exam was instant to manual testing, Plaintiff experienced fatigue that was likely to persist. (R. at 472.) Dr. Kalluri also stated that Plaintiff's baseline pain prevented him from prolonged sitting and leg fatigue prevented him from standing for any length of time, rendering Plaintiff unsuitable for most work activities. (R. at 472.) He also recommended Plaintiff continue with his home exercise program and finish his physical therapy regime. (R. at 472.)

On June 4, 2010, Plaintiff visited Dr. Kalluri, describing lower back pain radiating to the lateral aspect of the left leg. (R. at 468.) Plaintiff's incontinence had improved. (R. at 468.) Dr. Kalluri diagnosed these symptoms as residual deficits associated with Plaintiff's cauda equina syndrome. (R. at 468.) Plaintiff's physical examination was unremarkable except for decreased light touch at the right and left at L5 and his gait was described as normal. (R. at 468.) His straight leg raise was negative and x-rays of the lumbar spine showed that the hardware position was maintained and fusion appeared mature. (R. at 468.) Dr. Kalluri deemed the Plaintiff disabled due to low back and leg pain. (R. at 468.)

On May 31, 2011, Dr. Kalluri filled out a pain survey for Plaintiff and checked affirmatively that Plaintiff suffered from constant, severe pain that interfered with his ability to concentrate on job tasks and complete activities of daily living. (R. at 787.) Dr. Kalluri also affirmatively checked that there was objective medical evidence that would corroborate the severe pain that Plaintiff alleged. (R. at 787.) Dr. Kalluri described the nature of this evidence as Plaintiff's assertion that he could not stand or sit for more than ten minutes at a time. (R. at 787.) Dr. Kalluri also affirmed that Plaintiff often came into the office with a primary complaint of pain and stated definitively that Plaintiff's cauda equina syndrome caused Plaintiff's pain. (R. at 788.)

2. Post-Operative Care

On June 17, 2009, Carlton Miller, M.D. admitted Plaintiff to Healthsouth Rehabilitation Hospital for treatment, labs and consults, and physical therapy rehabilitation. (R. at 331-3.) Post-operatively, Plaintiff developed pain in both knees and dorsum of both feet and ankles with swelling. (R. at 333.) Dr. Miller prescribed a prednisone regime. (R. at 334.) Dr. Miller ordered an x-ray of both knees to look for any evidence of chondral calcinosis. (R. at 334.)

During his stay, Plaintiff experienced intractable low back pain radiating along the posterior and anterior aspect of the thigh. (R. at 282.) The pain was controlled with opioids. (R. at 282.)

On June 25, 2009, Plaintiff consulted with Redouane Goulmamine, M.D. (R. at 282.) At the time of discharge, Dr. Goulmamine described Plaintiff as "independent to modified independent" with activities of daily living and mobility. (R. at 146, 282.) Plaintiff could ambulate more than 300 feet with a rolling walker with modified independent level. (R. at 282.) Dr. Goulmamine recommended no further therapies for Plaintiff. (R. at 282.) Dr. Goulmamine described Plaintiff's discharge condition and prognosis as "good." (R. at 283.)

3.  Physical Therapy

On August 3, 2009, following one week of inpatient rehabilitation at Southside Regional Medical Center, Plaintiff reported to physical therapy ("PT") and complained of difficulty walking and decreased balance. (R. at 370.) He claimed to be suffering from lower extremity weakness, his knee giving out, numbness and tingling in his legs and coldness in his toes. (R. at 370.) Plaintiff ranked his best and worst symptoms as a 5/10. (R. at 370.) Plaintiff reported pain or difficulty with standing, walking, negotiating steps, sleeping through the night and transferring from sitting to standing. (R. at 370.) The physical therapist noted that Plaintiff presented with bilateral lower extremity weakness and parathesias limiting weight-bearing and functional activities. (R. at 370-71.) She opined that Plaintiff would benefit from PT to decrease pain and increase range of motion and strength to maximize function. (R. at 370-71.)

On August 7, 2009, Plaintiff complained of back soreness and continued difficulty walking. (R. at 409.) On August 13, 2009, Plaintiff complained of soreness, and he worked on core strength and stability with his physical therapist. (R. at 407.) On August 20, 2009, Plaintiff complained of right foot numbness and weakness in his right knee causing him to stand and fall.

7

(R. at 406.) On August 26, 2009, Plaintiff complained of cramping in his calf and continued difficulty walking. (R. at 405.) On August 28, 2009, Plaintiff reported to be suffering back pain and burning in both feet at night when they were cold. (R. at 404.)

On September 2, 2009, Plaintiff reported having a good day. (R. at 403.) On September 11, 2009, Plaintiff complained of pain. (R. at 402.) On September 18, 2009, Plaintiff's soreness had improved. (R. at 401.) On September 23, 2009, Plaintiff reported that his right knee was buckling and that his left foot was slapping. (R. at 400.) On September 25, 2009, Plaintiff reported no new complaints. (R. at 559.) On September 29, 2009, Plaintiff complained of constant back soreness, especially at night, despite his best efforts to stay active. (R. at 398.) Plaintiff claimed that if he walked fast, his left foot slapped the ground and that he took Vicodin every morning to relieve pain. (R. at 398.) Plaintiff could do daily chores and reported that his walking had improved, and he could ambulate standing upright. (R. at 398.)

During his next appointment, Plaintiff reported soreness all of the time and his therapist noted Plaintiff's limited progress. (R. at 397.) On October 8, 2009, Plaintiff stated during physical therapy that his back was sore. (R. at 555.) On October 13, 2009, Plaintiff complained of a nagging cramp in his calf and continued back soreness. (R. at 554.) On October 15, 2009, Plaintiff reported to his physical therapist that he could help his wife with chores around the house but still suffered from a sore back. (R. at 553.)

On October 20, 2009, Plaintiff reported severe pain from cramping in his calf at night. (R. at 392.) Plaintiff reported that he could do household work and his physical therapist noted significant improvement in her assessment. (R. at 391.) On October 27, 2009, Plaintiff reported improvement, although his back still ached and his right leg still cramped. (R. at 391.) He could stand for approximately one hour and could do yard work. (R. at 391.)

8

On November 6, 2009, Plaintiff arrived for PT and reported his back pain as 3 or 4 on a 10 point scale. (R. at 480.)   On November 11, 2009, Plaintiff complained of continued numbness and tingling in his leg and foot. (R. at 415.) Two days later, Plaintiff returned, complaining of soreness in his back. (R. at 416.) On November 18, 2009, Plaintiff reported that his pain was the same and that he was going for a sleep study that evening. (R. at 477.)

On November 20, 2009, Plaintiff reported having a good day and that his legs felt good, but that he was still experiencing numbness in his right foot. (R. at 418.) The physical therapist noted that Plaintiff tolerated that day's treatment without complaints of pain. (R. at 418.) On November 25, 2009, Plaintiff presented no new complaints during physical therapy. (R. at 419.) On December 1, 2009, Plaintiff complained of increased soreness and that he experienced greater lower extremity numbness on his right side than left. (R. at 474.)

On December 3, 2009, Plaintiff could successfully negotiate steps without deviation in a step-over pattern, could transition from sitting to standing without support and could demonstrate good posture and body mechanics. (R. at 421.) The physical therapist believed that Plaintiff would benefit from continuing his home exercise plan. (R. at 421.) The following day, Dr. Kalluri reevaluated and recommended that Plaintiff continue his home exercise plan and finish physical therapy. (R. at 422-23.)

4. Primary Care

On July 2, 2009, Brian Doeren, M.D. noted that Plaintiff was doing well post-operatively and that he did "not need much" except prescription refills. (R. at 313.) Plaintiff wanted to start running again, but Dr. Doeren advised Plaintiff to wait a few weeks before jogging. (R. at 313.) Dr. Doeren deemed Plaintiff's coronary artery disease and gout stable. (R. at 313.) Plaintiff was generally without complaint and appeared "quite well." (R. at 313.)   Plaintiff's chest was clear

to auscultation in all fields and his heart had a regular rate and rhythm without murmur. (R. at 313.)

On July 23, 2009, Plaintiff sought primary care, complaining of symptoms of restless leg syndrome that seemed to have been exacerbated after his spinal surgery. (R. at 312). Plaintiff slept two or three hours of sleep at night as he must "walk it off." (R. at 312.) Plaintiff also stated that his legs were generally fine during the day, but he experienced cramps upon laying down. (R. 312.) Plaintiff's legs appeared normal. (R. at 312.)

In October of 2009 while attending PT, Plaintiff also sought primary care for other health-related conditions. (R. at 310.) Although medication controlled his gout, Plaintiff suffered from shortness of breath and palpitations with exertion, trouble sleeping at night and somewhat uncontrolled depression. (R. 310.) An EKG revealed a normal sinus rhythm. (R. at 310.)

On a November 9, 2009 visit for follow-up on blood lab work, Amir Shah, M.D. noted Plaintiff's cholesterol as abnormal and his "bad" cholesterol, triglycerides and creatinine levels as elevated. (R. at 309.) Plaintiff's renal insufficiency was likely due to gout and hypertension and his medications were adjusted accordingly. (R. at 309.)

On November 9, 2009, Plaintiff, accompanied by his wife, saw Edmund Cornman, M.D. regarding possible obstructive sleep apnea. (R. at 321.) Plaintiff stated that he was dependent on Ambien for sleeping, and his wife stated that he snored loudly, made intermittent loud snorts and gasps for air and paused in his breathing during the night. (R. at 321.) Plaintiff awoke with pain in his legs or in his feet, primarily due to cramping. (R. at 321.) Plaintiff stated that he felt tired and unrefreshed by his sleep, but that five or ten minute naps in the morning or afternoon sometimes helped. (R. at 321.) Plaintiff had gained approximately twenty pounds in the past

year and Dr. Cornman described Plaintiff as "overly nourished." (R. at 322.) Plaintiff claimed

that he frequently lost track of what he was doing during routine activities of the day. (R. at

321.) Dr. Cornman discussed with Plaintiff and his wife how Plaintiff's cauda equina syndrome

could be an underlying cause for his restless leg syndrome and periodic limb movements. (R. at

321.) Dr. Cornman suggested a period of iron supplementation if Plaintiff's periodic limb

movements persisted as a problem. (R. at 322.)

   On November 18, 2009, Plaintiff underwent a sleep study. (R. at 318.) His overnight

polysomnogram revealed evidence of severe obstructive sleep apnea with a total apnear/hyponea

index of 34.8 events per hour and a lowest event-related oxygen saturation of 84%. (R. at 318.)

Dr. Cornman deemed the study abnormal due to the presence of severe obstructive sleep apnea

and periodic limb movements. (R. at 319.) Dr. Cornman noted no arrhythmias or other

parasomnias. (R. at 319.) Dr. Cornman recommended CPAP titration, adjusted Plaintiff's

medications and advised Plaintiff to follow-up in six weeks. (R. at 318.)

   On December 6, 2009, Plaintiff returned to the CPAP lab for a CPAP titration for his

severe obstructive sleep apnea. (R. at 435.) His study revealed that a CPAP pressure of 11 cm

$H_2O$ adequately resolved a majority of his obstructive sleep-disordered breathing. (R. at 435.)

Plaintiff did not manifest frequent limb movements through the night and reportedly woke

feeling that he had slept better than usual. (R. at 435.) Dr. Cornman recommended that Plaintiff

try home CPAP therapy, maintain exercise and appropriate diet, avoid driving when drowsy and

avoid alcohol or other sedative medications within three hours of going to sleep. (R. at 435.) Dr.

Cornman concluded that this study resolved the majority of Plaintiff's obstructive sleep disorder

breathing with the use of CPAP. (R. at 436.)

On April 16, 2010, Dr. Cornman counseled Plaintiff on his obstructive sleep apnea and the nature of restless leg syndrome and periodic limb movements as sources of sleep disruption. (R. at 434.)   Plaintiff stated that he did not sleep soundly and complained that his legs tingled at night. (R. at 434.)  Dr. Cornman discussed the importance of learning appropriate dietary habits and using dietary and exercise interventions to achieve weight loss.  (R. at 434.)

On January 7, 2011, Plaintiff returned for a follow-up evaluation for his severe obstructive sleep apnea and restless leg syndrome.  (R. at 772.)  Plaintiff complained of some difficultly with sinus drainage and sore throat, stating that he slept at his mother's house frequently where there was a lot of mold.  (R. at 772.)  Plaintiff further stated that he did a lot of work cleaning up mold in his mother's house and had more problems with back pain and lower leg numbness.  (R. at 772.)  He also noted greater tingling in the bottom of his feet.  (R. at 772.)  Dr. Cormann discussed the cardiovascular risks of untreated sleep apnea and the importance of wearing his mask every night.  (R. at 772.)

On August 25, 2010, Plaintiff visited Christopher Ogburn, M.D. and did not voice any complaints of leg or back pain. (R. at 759.)  On November 4, 2010, Plaintiff visited Clifford V. Morris, M.D., complaining of increased abdominal girth and lower extremity swelling.  (R. at 784.)  The swelling appeared to be localized to the upper portion of the legs, and Plaintiff was negative for other symptoms.  (R. at 784.)

On November 4, 2010, Dr. Shah reviewed Plaintiff's echocardiogram and determined that Plaintiff had normal sinus rhythm with no acute changes.  (R. at 784.)  Dr. Shah opined that Plaintiff's coronary artery disease appeared stable.  (R. at 785.)  On December 30, 2010, Plaintiff returned to Dr. Ogburn, complaining of increased swelling in his legs.  (R. at 778.)  Dr. Ogburn correlated Plaintiff's increased stress and poor energy and motivation levels with Plaintiff's

increased likeliness of being irritable or angry. (R. at 778.) His motivation and energy levels had been noticeably poor. (R. at 778.)

On February 17, 2011, Plaintiff returned for follow-up on his blood pressure and renal function. (R. at 776.) Plaintiff experienced some swelling in his legs. (R. at 776.) Plaintiff was not exercising, but was taking care of his elderly mother. (R. at 776.) On May 26, 2011, Plaintiff saw Dr. Ogburn for a follow-up evaluation, stating that the swelling in his legs was much better after switching his blood pressure medications. (R. at 774.) Plaintiff did not adhere to an exercise program, but was doing a lot of yard work. (R. at 774.) He had not suffered recent gout attacks and Ambien successfully helped him sleep. (R. at 774.) Plaintiff complained of tingling in his left shoulder that had been present for several months without any clear injury or associated trauma. (R. at 744.)

On September 29, 2011, Plaintiff again visited Dr. Ogburn. (R. at 790.) Plaintiff reported cutting back on his salt intake, limiting his intake of fried foods and red meat, but not yet exercising. (R. at 790.) Dr. Ogburn recommended increasing exercise to four days a week in conjunction with restricting Plaintiff's diet. (R. at 790.)

C. Function Reports

On September 30, 2010, Plaintiff completed a Function Report. (R. at 193.) Plaintiff lived at home with his family. (R. at 193.) Plaintiff indicated that his day included cleaning up, getting dressed, eating breakfast, watching television, reading, going out to his shed to "mess with HAM radios" and resting when needed. (R. at 193.) While visiting his mother's house, Plaintiff did "pretty much the same things plus whatever [he] can and needed to do to help [his] mother." (R. at 193.) Plaintiff and his sister cared for their mother who had dementia and limited mobility. (R. at 194.) Plaintiff's condition affected his ability to walk, sit, stand, bend or

13

drive for long periods of time. (R. at 194.) Plaintiff could not lift or carry as much as before

onset of his condition. (R. at 194.) Due to constant pain, numbness and leg cramps, Plaintiff

sometimes found difficulty sleeping. (R. at 194.) Plaintiff's condition did not affect his abilities

to perform personal care activities such as shaving or using the toilet. (R. at 194.) Plaintiff

needed no reminders to tend to his personal needs, but required reminders from his wife about

taking his medications in the morning. (R. at 195.) Plaintiff's wife did the majority of cooking,

but he could feed himself in her absence. (R. at 195.)

Plaintiff indicated that he could perform most of the normal household chores or yard

work. (R. at 195.) Plaintiff took hours or days to complete a task. (R. at 195.) He needed

assistance completing chores or repairs around the house. (R. at 195.) While Plaintiff still liked

to try to do house or yard work, his stamina and strength had declined. (R. at 196.) Plaintiff

went outside as often as he liked. (R. at 196.) When he went out, he would either drive or ride

in a car and he was able to go out alone. (R. at 196.) Plaintiff indicated that he shopped both in

stores and by phone for radio and computer parts, books and movies. (R. at 196.) He could also

count change, pay bills, handle a checking account and use a checkbook or money orders. (R. at

196.) His condition did not affect his ability to handle his finances. (R. at 197.)

Plaintiff listed his hobbies as HAM radios, reading, watching television and messing

around on the computer. (R. at 197.) He did these activities most days and could do them well.

(R. at 197.) Plaintiff spent time with his wife and family, mostly just sitting around talking and

watching television. (R. at 197.) He also went to his mother's home every other week and did

not need reminders or company when going out. (R. at 197.)

Plaintiff indicated that he did not have any problems getting along with others and did not

describe any changes in social activities since his condition began. (R. at 198.) His condition

affected his: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair

climbing and completing tasks.  (R. at 198.)  Plaintiff could not comfortably lift more than

twenty pounds or walk longer than fifteen minutes before needing to stop and rest.  (R. at 198.)

Plaintiff's level of pain would determine how long he needed to rest, anywhere between five to

twenty minutes.  (R. at 198.)  Plaintiff indicated that he did not have any trouble paying attention

for as long as he desired and indicated that he finished activities that he started.  (R. at 198.)  He

also could follow written and spoken instructions without a problem.  (R. at 198.)  He did not

have trouble getting along with authority figures and indicated that he handled stress "as well as

anyone."  (R. at 199.)

D.  Plaintiff's Testimony

On November 16, 2011, Plaintiff, represented by counsel, testified at a hearing in front of

an ALJ.  Plaintiff's request to stand during questioning was approved.  (R. at 33.)  Plaintiff lived

in a single story brick house with his wife.  (R. at 37.)  Plaintiff indicated that he had been

receiving Social Security retirement benefits since he turned sixty-five.  (R. at 39.)  Plaintiff had

a valid driver's license and access to a car that he drove one to two times a week, usually to the

auto store to purchase parts.  (R. at 40.)

Plaintiff testified that he had not worked for anyone or anywhere since his disability onset

date of June 5, 2009.  (R. at 40-41.)  Plaintiff had not had any operations or injections since June

5, 2009, but had been taking prescription medications.  (R. at 42.)  Plaintiff took over-the-counter

pain medication.  (R. at 42.)  Plaintiff could safely lift about twenty pounds.  (R. at 44.)  He

could also stand for fifteen to twenty minutes before needing to sit down.  (R. at 44.)  Plaintiff

could sit for approximately the same amount of time as he could stand.  (R. at 44.)  He could

walk for no more than ten or fifteen minutes.  (R. at 44.)  He owned a computer and used it for

research.  (R. at 45.)  During an average day, he spent 20-30 minutes looking for information on the computer.  (R. at 45.)

Plaintiff slept for five to six hours at night when he took Ambien.  (R. at 45.)  On average, he napped twice a week for approximately 15-20 minutes.  (R. at 45.)  Plaintiff's cane was not prescribed.  (R. at 46.)  He did not use the cane when caring for his mother.  (R. at 46.)  Since June 5, 2009, Plaintiff had gone shopping by himself and had prepared some of his own meals.  (R. at 46.)  He also cleaned and performed limited yard work.  (R. at 46.)  Plaintiff cared for his mother for approximately a year, staying at her home for a week at time.  (R. at 46-47.)  He further explained that his mother suffered from Alzheimer's Disease and that he and his sister had chosen to watch their mother in turn rather than putting her in a convalescent home.  (R. at 47.)  Plaintiff helped his mother get to the bathroom and change her clothes, in addition to making her dinner.  (R. at 56.)

Plaintiff indicated that he had several special interests, one being an amateur radio operator.  (R. at 47.)  He also went to club meetings about once a month and socialized with family and friends.  (R. at 48.)  He did not need any help on a daily basis with his personal care.  (R. at 48.)  Plaintiff stated that he had been to physical therapy since June 5, 2009, but that it did not help.  (R. at 49.)  He also stated that he exercised on his own and that he stayed active and kept moving.  (R. at 49.)  Since June 5, 2009, none of Plaintiff's health care providers had recommended an operation, procedure, treatment or medication that Plaintiff declined.  (R. at 49.)  Plaintiff had never been put on any sort of permanent restriction or told by a health care provider to never do something again.  (R. at 49.)

Plaintiff indicated that his weight had increased due to inactivity, explaining further that while "staying busy," he consciously made sure not to "bite off more than [he] could chew."  (R.

at 52.) His doctors had asked him to get out and walk on a regular basis to stay healthy. (R. at 52-53.) He explained that due to the numbness in his right leg from the hip down, he could not walk the suggested amount of time. (R. at 53.) He described the sensation in his right leg as cold and the bottom of his foot as having fallen asleep. (R. at 53.) While walking, Plaintiff sometimes stumbled making a left or right turn, because his right leg had a tendency to "delay" his brain's command. (R. at 53.) He had fallen in his shed several months before and explained that he used his two canes three to four times a week when he went out, but not when he was with his mother. (R. at 53-54.)   Plaintiff would lie down to help relieve the numbness and he explained that certain leg exercises no longer provided him any relief. (R. at 54.) He did this at least once a day for 15-20 minutes. (R. at 54-55.)

Plaintiff indicated that he could lift five pounds repetitively. (R. at 55.) He sometimes experienced a stabbing pain above his hip that moved down his leg, reaching above six on a one-to-ten pain scale. (R. at 55.) He also described his pain as generally low, dull and constant, and limiting to his daily activities. (R. at 57.)

E.  State Agency Physician

On November 19, 2010, J. Astruc, M.D. assessed Plaintiff's residual functioning capacity ("RFC"). (R. at 74-83.) Dr. Astruc opined that while Plaintiff did experience back pain, the medical evidence suggested that Plaintiff had improved well since the surgery and he maintained a good range of motion in his spine. (R. at 83.) While the evidence indicated that Plaintiff had some limitations, the limitations would not prevent Plaintiff from performing past relevant work as a security guard. (R. at 82.)

Specifically, Dr. Astruc found that, based on the evidence, Plaintiff had some exertional limitations: he could occasionally lift 20 pounds and frequently lift 10 pounds; he could stand,

sit and walk about six hours in an eight-hour day; and he retained the unlimited ability to push and pull objects. (R. at 79.)  Dr. Astruc noted that while Plaintiff did have postural limitations, he could frequently climb stairs or ramps, kneel, crawl, balance and crouch. (R. at 80.)  Plaintiff could occasionally stoop and climb ladders, ropes or scaffolds. (R. at 80.)  Plaintiff did not have any manipulative, visual, communicative or environmental limitations. (R. at 80.) Consequently, Dr. Astruc determined that Plaintiff was not disabled. (R. at 82.)

## II.   PROCEDURAL HISTORY

On July 27, 2010, Plaintiff filed an application for a period of disability and DIB with an alleged onset date of June 5, 2009. (R. at 20.)  Plaintiff claimed that he suffered from degenerative disc disease and spinal stenosis, along with vision and hearing difficulties. (R. at 172).  Plaintiff's claim was initially denied at the administrative level by the Social Security Administration ("SSA")[2] on October 6, 2010. (R. at 88.)  The claim was again denied on November 19, 2010, after review by a state agency physician. (R. at 100.)

Plaintiff filed a written request for a hearing and Plaintiff, represented by counsel, testified before the ALJ during a hearing held on November 16, 2011. (R. at 20.)  On December 7, 2011, the ALJ denied Plaintiff's request for benefits, concluding that Plaintiff was not disabled based on his past relevant work experience, the physical and mental demands of such work and his RFC. (R. at 20-26.)

On April 9, 2013, the Appeals Council granted Plaintiff's request for review. (R. at 145.) The Appeals Council issued a corrective decision that specifically discussed Dr. Kalluri's

---

[2]   Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

opinion and determined that Plaintiff was not disabled, because Plaintiff could perform light

work consistent with his prior work as a security guard. (R. at 5-6).

### III.   QUESTIONS PRESENTED

1.  Did the ALJ err in assessing Plaintiff's credibility?

2.  Does substantial evidence support the Appeals Council's decisions to afford less than controlling weight to Plaintiff's treating physician's opinion?

3.  Did the ALJ and Appeals Council properly evaluate the state agency physician's opinion?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether substantial evidence in the record supports the Commissioner's decision

and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.*

*Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a

whole, but may not "'undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472

(quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on

the record as a whole, the Court must "'take into account whatever in the record fairly detracts

from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings

as to any fact, if substantial evidence in the record supports the findings, are conclusive and must

be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*,

667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which

significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R.

§ 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles

one to benefits under the Act, it must cause more than a minimal effect on one's ability to

function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must

determine whether the claimant can return to his past relevant work[3] based on an assessment of

the claimant's residual functional capacity ("RFC")[4] and the "physical and mental demands of

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work

can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the

claimant through step four of the analysis, such that he must prove that his limitations preclude

him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987);

*Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the

---

[3]      Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[4]      RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

V. ANALYSIS

A.  The ALJ's Decision

On November 16, 2011, the ALJ held a hearing during which Plaintiff, represented by counsel, testified. (R. at 33-59.) On December 7, 2011, the ALJ rendered his decision in a written opinion, determining that Plaintiff was not disabled under the Act. (R. at 20-26.)

The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. 20-26); *see also* C.F.R. § 404.1520(a). The ALJ found at step one that Plaintiff had not engaged in SGA since his alleged onset date. (R. at 22.) At step two, the ALJ determined that Plaintiff suffered severe impairments of degenerative disc disease of the lumbar spine, post-operative fusion and sleep apnea. (R. at 22.) At step three, the

22

ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; (R. at 23). The ALJ next determined that Plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). (R. at 23.) The ALJ determined that Plaintiff could perform his past relevant work. (R. at 26.) Finally, at step five of the analysis, based upon Plaintiff's age, education, work experience, testimony and RFC, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 26.)

B. The Appeals Council Decision

On April 9, 2013, the Appeals Council granted Plaintiff's request for review. (R. at 4.) The Appeals Council issued a corrective unfavorable decision, finding that Plaintiff was not disabled under the Act. (R. at 4-7.) The Appeals Council adopted the ALJ's statements regarding the issues in the case and the evidentiary facts. (R. at 4.) Further, the Appeals Council agreed with the ALJ's findings under steps one through four of the sequential evaluation. (R. at 5.) In the corrective unfavorable decision, the Appeals Council specifically addressed Dr. Kalluri's opinion and assigned that opinion little weight, because it was inconsistent with other evidence in the record. (R. at 5-6.)

Plaintiff challenges the ALJ's decision and the Appeals Council's corrective decision on three grounds. First, Plaintiff argues that the ALJ erred in determining Plaintiff's credibility. (Pl.'s Mem. at 11-14.) Additionally, Plaintiff argues that the Appeals Council erred in affording Plaintiff's treating physician less than controlling weight. (Pl.'s Mem. at 4-10.) Finally, Plaintiff contends that the ALJ and Appeals Council erred by failing to state the extent of the weight that the ALJ assigned to the opinion of the state agency physician. (Pl.'s Mem. at 10-11.)

C. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ erred, because he improperly discredited Plaintiff's

subjective complaints of pain as they were not fully corroborated by the objective medical

findings. (Pl.'s Mem. at 11.) Defendant maintains that substantial evidence supports the ALJ's

credibility determination. (Def.'s Mot. for Summ. J. and Mem. in Supp. Thereof ("Def.'s

Mem.") at 20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant

can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20

C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must

follow a two-step analysis.  *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R.

§§ 404.1529(a), 416.929(a).  The first step is to determine whether there is an underlying

medically determinable physical or mental impairment or impairments that reasonably could

produce the individual's pain or other related symptoms.  SSR 96-7p at 1-3.  The ALJ must

consider all of the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5,

n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant

medical evidence in the record").  If the underlying impairment reasonably could be expected to

produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a

claimant's statements about the intensity and persistence of the pain and the extent to which it

affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take

into account "all the available evidence," including a credibility determination of the claimant's

statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 10011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ concluded that based on the evidence, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's determination that Plaintiff had the RFC to perform a full range of light work. (R. at 23.) Substantial evidence supports the ALJ's credibility determination.

Plaintiff's medical records support the ALJ's credibility determination. On June 22, 2009, and August 6, 2009, Dr. Kalluri reported that Plaintiff experienced no focal motor deficits. (R. at 367, 374.) On July 2, 2009, Dr. Doeren opined that Plaintiff appeared quite well. (R. at 313.) On October 2, 2009, Plaintiff's lumbar range of motion nearly reached full extension. (R. at 378.) On October 20, 2009, Plaintiff's physical therapist reported Plaintiff's significant improvement. (R. at 391.) On December 4, 2009, Plaintiff had no impairments in his tandem walking, walking on his toes or impairment in his gait. (R. at 471.) On June 4, 2010, Plaintiff's physical examination was generally unremarkable and Plaintiff had a normal gait. (R. at 468.) On August 25, 2010, Plaintiff did not report any complaints of back or leg pain to Dr. Ogburn. (R. at 759.) On May 26, 2011, Dr. Ogden noted that Plaintiff did not complain of leg or back pain. (R. at 25, 774.) On September 29, 2011, during a follow-up with Dr. Ogburn, Plaintiff did not complain of swelling in his legs or pain. (R. at 790.) Further, Dr. Ogburn recommended that Plaintiff increase his exercise regime to four days a week. (R. at 790.)

Additionally, Plaintiff's own statements support the ALJ's credibility determination. Plaintiff's alleged pain had no effect on his ability to shave, feed himself, prepare meals or use the toilet. (R. at 25, 194.) Plaintiff testified that he cleaned around his residence and did some yard work and gardening. (R. at 46.) Plaintiff drove several times a week to the auto store and used the computer for research in increments of 20-30 minutes. (R. at 40, 45.) Plaintiff testified that he took care of his elderly mother, staying with her for up to a week at a time, every other week. (R. at 25, 47.) Plaintiff had no trouble drying off and dressing his mother. (R. at 56.) Since June 5, 2009, none of his health-care providers had placed Plaintiff on any sort of permanent restriction or indicated an activity that he should never do again.

(R. at 49.) On January 7, 2011, Plaintiff visited Dr. Corman to assess his sleep apnea and stated that he was doing a lot of work cleaning up mold while at his mother's house. (R. at 772.) On May 26, 2011, Plaintiff told Dr. Ogburn that he was engaged in "a lot of yard work." (R. at 25, 774.) Therefore, substantial evidence supports the ALJ's credibility determination.

### D. The Appeals Council did not err in affording less than controlling weight to Plaintiff's treating physician.

Plaintiff argues that the Appeals Council and ALJ erred by affording Plaintiff's treating physician's opinion less than controlling weight. (Pl.'s Mem. at 4.) Defendant responds that substantial evidence supports the Appeals Council's decision. (Def.'s Mem. at 13-19.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.

*Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, e.g., when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported.  20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating physician's opinions:  (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors.  20 C.F.R. §§ 404.1527(d)(2)-(6).  However, those same regulations specifically vest the ALJ — not the treating physicians — with authority to determine whether a claimant is disabled as that term is defined by statute.  20 C.F.R. § 404.1527(e)(1).

Here, because the medical records offered conflicting opinions, the Appeals Council had to reconcile the divergent opinions.  Ultimately, the Appeals Council afforded Dr. Kalluri's opinion that Plaintiff was totally disabled less than controlling weight.[5]  (R. at 5-6.)  Substantial evidence supports the Appeals Council's determination.

Dr. Kalluri's own records support the Appeals Council's determination.  On June 4, 2010, Plaintiff's examination returned essentially normal results.  (R. at 468.)  Plaintiff had normal muscle strength, tone and gait.  (R. at 468.)  Plaintiff's straight-leg-raising test was negative and there was moderate tenderness to palpation with no paraspinous muscle spasm.  (R.

---

[5]  "When the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow."  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

at 468.) X-rays also confirmed good hardware positioning and mature fusion. (R. at 468.) On

June 22, 2009, Dr. Kalluri noted that Plaintiff had no focal motor deficits. (R. at 367.) Again on

August 6, 2009, Dr. Kalluri reported that Plaintiff experienced no focal motor deficits. (R. at

367, 374.)

Other medical records support the Appeals Council's finding. Dr. Goulmamine

described Plaintiff as "independent to modified independent" with activities of daily living and

mobility. (R. at 146.) Dr. Goulmamine opined that Plaintiff's prognosis was "good." (R. at

283.) On July 2, 2009, Dr. Doeren opined that Plaintiff appeared quite well. (R. at 313.) On

October 2, 2009, Plaintiff's lumbar range of motion nearly reached full extension. (R. at 378.)

On October 20, 2009, Plaintiff's physical therapist reported that Plaintiff had significantly

improved. (R. at 391.) On December 4, 2009, Plaintiff had no impairment in his tandem

walking, walking on his toes or impairment in his gait. (R. at 471.) On June 4, 2010, Plaintiff's

physical examination was generally unremarkable and Plaintiff exhibited normal gait. (R. at

468.) On August 25, 2010, Plaintiff did not report any complaints of back or leg pain to Dr.

Ogburn. (R. at 759.) On May 26, 2011, Dr. Ogburn noted that Plaintiff again did not complain

of leg or back pain. (R. at 25, 774.)   On September 29, 2011, Plaintiff did not complain of

swelling in his legs or pain. (R. at 790.) Dr. Ogburn recommended that Plaintiff should increase

his exercise to four days each week. (R. at  790.)

Further, Plaintiff's own statements support the Appeals Council's determination.

According to Plaintiff, he could still do most normal household chores. (R. at 195.) He also

drove a car, shopped on his own, used the computer, read books, watched television and pursued

his amateur radio hobby. (R. at 196-97, 220.) Plaintiff could count change, pay bills, use a

checkbook and handle a checking account. (R. at 196-97.) Plaintiff testified that he could safely

lift approximately twenty pounds. (R. at 44.) Further, Plaintiff cared for his mother regularly, and he helped her use the bathroom and cooked her meals. (R. at 56.)

Therefore, substantial evidence supports the Appeals Council's determination to afford less than controlling weight to Dr. Kalluri's opinion that Plaintiff was disabled.

F. The ALJ and Appeals Council erred in evaluating the opinion of the state agency physician.

Plaintiff argues that the ALJ erred by not stating the extent of the weight that he afforded to the state agency physician's opinion. (Pl.'s Mem. at 10.) Defendant argues that the ALJ and Appeals Council both adequately addressed the state agency physician's opinion. (Def.'s Mem. at 19-20.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 416.927(c)(2), (d).

When considering a state agency medical consultants opinion, the ALJ must evaluate those findings just as any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii). The ALJ must "explain in the decision the weight given to the opinions of a

[s]tate agency medical . . . consultant . . ., as the [ALJ] must do for any opinions from treating

sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(2)(ii);

416.927(e)(2)(ii). Determining the specific weight of medical opinions is especially important,

because the regulations further require a comparative analysis of competing medical opinions.

*See, e.g.,* 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the

opinion of a source who examined [plaintiff] than to the opinion of a source who has not

examined [plaintiff].")

Requiring an ALJ to assign specific weight to medical opinions is necessary, because a

reviewing court "faces a difficult task in applying the substantial evidence test when the

[Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. &*

*Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). Unless the Commissioner "has sufficiently

explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is

supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting

*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). The

assignment of weight needs to be sufficiently specific "to make clear to any subsequent

reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for

that weight." SSR 96-2p (discussing affording weight to treating physician); *see also*, SSR 96-

6p (requiring that an ALJ "explain the weight given to the opinions" of state agency physicians).

Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's

findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence."

*Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980,

983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)).

In this case, the ALJ stated that he was required to treat the opinions of state agency medical consultants as expert opinion evidence and that he was not bound by their conclusions. (R. at 25.)  The ALJ went on to state that he had "considered their opinions and given them appropriate weight in rendering this decision.  These medical experts have indicated that the claimant has the necessary mental and physical residual functional capacity to perform work." (R. at 25.)

In discussing the state agency medical consultant's opinion, the ALJ merely stated that he gave the opinion "appropriate weight," because the opinion indicated that Plaintiff could "perform work." (R. at 25.)  In simply stating that he assigned the opinion "appropriate weight," the Court cannot identify — and therefore review — the specific weight that the ALJ afforded the opinion.  In giving "appropriate weight," the ALJ merely restates the requirement that he assign weight to the opinion.  "Appropriate" in this context is merely conclusory and not sufficiently specific to quantify the weight that the ALJ assigned.  Accordingly, the ALJ erred. *See Stawls*, 596 at 1213 (finding error where Secretary failed to indicate weight afforded certain medical opinions); *Derrickson v. Astrue*, 2012 WL 3555502, at *13 (E.D. Va. June 29, 2012) (finding error where ALJ failed to afford weight to state agency physician's opinion and "seemingly afford[ed]" it greater weight than treating physician).  Therefore, this Court cannot say that substantial evidence supports the ALJ's determination. *See Gordon*, 725 F.2d at 235 ("We cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all relevant evidence.").  Because the ALJ did not sufficiently set forth the specific weight afforded to the state agency physician's

opinion, the Court recommends remand to the Commissioner to indicate with explanation the specific weight. *See id.* at 236 ("We therefore remand . . with directions . . . to indicate explicitly the weight afforded to the various medical reports in the record.")

IV.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED; that Defendant's Motion for Summary Judgment (ECF No.15) be DENIED; and that the final decision of the Commissioner be REVERSED and REMANDED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

 

 

                                         _____ /s/

                                         David J. Novak
                                         United States Magistrate Judge

Richmond, Virginia
Date: September 2, 2014

33